136 F.3d 884
 157 L.R.R.M. (BNA) 2065
 CLEVELAND WRECKING COMPANY, Plaintiff-Appellant,
v.
IRON WORKERS LOCAL 40, John Kelly, in his official
representative capacity as President of Iron Workers Local
Union 40, and Iron Workers Locals 40, 361 & 417 of the
International Association of Bridge Structural and Iron
Workers Union Security Funds, Defendants-Appellees.
 Nos. 293, Docket 97-7066.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 22, 1997.
Decided Dec. 22, 1997.
 
 Bradford W. Coupe, New York City (Andrew J. Schaffran and Amber Kagan, Morgan, Lewis & Bockius LLP, New York City, On the Brief), for Plaintiff-Appellant.
 Edward J. Groarke, Garden City, NY (Carol L. O'Rourke, Colleran, O'Hara & Mills, Garden City, N.Y., Of Counsel), for Defendants-Appellees.
 Before: LEVAL and PARKER, Circuit Judges, and BAER, District Judge.[1]
 PER CURIAM:
 
 
 1
 Plaintiff Cleveland Wrecking Co. appeals from an order of the U.S. District Court for the Southern District of New York (John E. Sprizzo, J.) denying plaintiff's motion to stay arbitration of a dispute under the parties' collective bargaining agreement and granting defendants' cross-motion to compel arbitration. See Cleveland Wrecking Co. v. Iron Workers Local Union 40, 947 F.Supp. 745 (S.D.N.Y.1996). We affirm, although our reasoning differs from that of the district court.
 
 Background
 
 2
 Defendants-appellees are a union ("the Union") and its associated employee benefit funds. Plaintiff-appellant Cleveland Wrecking Co. ("Cleveland" or "the employer") is an employer with whom defendant first entered into a collective bargaining relationship in 1977. A subsequent collective bargaining agreement ("the CBA" or "the agreement") was executed between the parties, initially to cover the period July 1, 1981 to June 30, 1984. Under the CBA, Cleveland was required to employ only members of the Union when performing work within the Union's defined trade and geographical jurisdiction. The CBA defines the geographical jurisdiction of the Union to include Manhattan. Section 2 of the CBA defines the craft jurisdiction of the Union to include "[a]ll work pertaining to the erection, alteration and demolition of structural steel, structural metals ... [and a]ll work on buildings, bridges, and all other structures" involving the demolition of structural steel. The agreement contains an "evergreen clause" providing that the CBA will remain in force until 1984 and automatically be renewed each year unless one of the parties terminated the agreement by giving written notice to the other party at least four months prior to the expiration of the contract year.
 
 
 3
 The CBA also contains several provisions relating to the resolution of disputes. The general arbitration provisions are in Section 36. Section 36(1) provides that:
 
 
 4
 Any grievance, complaint, or dispute between the Union and the Employer arising out of this Agreement or as to the meaning, interpretation, application or alleged violation of any provision or provisions of this Agreement, except as provided in subsection (2) of this Section, shall be handled in the first instance by an officer of the Union designated by the Union and a representative of the Employer.
 
 
 5
 [ ] If the designees of the Union and the Employer fail to reach agreement within three (3) work days after they meet, as provided above, the grievance, complaint, or dispute shall be submitted for final and binding determination to Hon. Walter L. Eisenberg, as the Impartial Arbitrator.
 
 Section 36(2) provides that:
 
 6
 The foregoing provisions for arbitration are not intended and shall not be construed as in anywise qualifying or making subject to change any provisions of this Agreement including, but not limited to the handling of negotiations for a new Agreement, change in wage scale or jurisdictional disputes.
 
 
 7
 In addition, Section 2 of the CBA, which defines the Union's craft jurisdiction, also mentions arbitration under a different regimen, stating:
 
 
 8
 It is agreed that the jurisdiction of work covered by this Agreement is that provided for in the charter grant issued by the American Federation of Labor to the INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, it being understood that the claims are subject to trade agreements of which the INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS AFL-CIO is a party, as well as the decisions rendered by the Joint Trade Arbitration Plan of the New York Building Trades, and the National Joint Board for the Settlement of Jurisdictional Disputes to and including June 30, 1981.
 
 
 9
 The parties to this Agreement are subject to and agree to be bound by all decisions and awards made by the Joint Trade Arbitration Plan of the New York Building Trades with respect to all jurisdictional disputes which may arise under this Agreement.
 
 
 10
 The "Joint Arbitration Plan" referred to in this section, also known as the "New York Plan," is a mechanism established by the Building and Construction Trades Council of Greater New York (the "BCTC") and the Building Trades Employers' Association of the City of New York (the "BTEA") for the orderly settlement of jurisdictional disputes between various trade unions. The New York Plan's multistage process provides that "[w]henever a dispute arises over an assignment of work on a job site," the union objecting to the assignment "shall request a meeting on the job site" with the union "in possession of the work assignment" in an attempt to resolve the dispute. If this meeting is ineffective, then the union "contesting the assignment may submit the dispute to the [BCTC] for mediation"; "[e]mployers are not allowed to participate in the mediation hearing." "If the dispute is not resolved through mediation," the union "contesting the assignment may submit the matter for arbitration to the Executive Committee of the BTEA by request in writing to the [BCTC] setting forth a description of the work involved in the dispute and requesting a date for a hearing." The Plan further specifies procedures to be used in connection with the arbitration phase and states that the award made by the arbitration panel "shall be added to previous awards made and printed and published in the Handbook of the BTEA, commonly referred to as 'the Green Book', and shall thereafter govern the awarding of the work of the kind in question on all future jobs."
 
 
 11
 According to Cleveland, in February 1991 (more than four months prior to the end of the contract year ending June 30, 1991), Cleveland mailed the Union written notice of termination of the CBA. The union claims never to have received the letter. Since the end of that contract year, Cleveland has not employed workers from the Union.
 
 
 12
 On June 1, 1993, Cleveland entered into a collective bargaining agreement with another union, Mason Tenders District Council of Greater New York ("Mason Tenders"), under which Cleveland agreed to use Mason Tenders exclusively for the demolition and removal of structural steel. Consistent with this latter agreement, Cleveland hired Mason Tenders to begin working on a Consolidated Edison project in Manhattan ("the job site").
 
 
 13
 When the Union became aware that Cleveland was employing Mason Tenders members to do this work at the job site, it attempted to have the work reassigned to it. When this proved fruitless, the Union proceeded on two tracks. On the first track, the Union in May 1994 sought mediation with Mason Tenders pursuant to the New York Plan--to which both unions are signatories--with the aim of having the work reassigned to it. The mediators apparently were of the view that the work should have been given to the Union and not to Mason Tenders; the President of the BCTC wrote to Mason Tenders that "the work in question ... is explicitly [in] the jurisdiction of Ironworkers Union Local # 40" and "direct[ed]" Mason Tenders "to remove your members from the work in question." When Mason Tenders failed to comply with this directive, the Union did not seek the further available step of arbitration against Mason Tenders under the New York Plan.
 
 
 14
 On the second track, the Union sought arbitration under the CBA with Cleveland, with the aim of recovering money damages (including lost wages and benefits, attorneys fees, liquidated damages, interest, and the costs of arbitration) for Cleveland's alleged breach of the CBA. To this end, counsel for the Union and the Funds sent a demand to Cleveland for arbitration of, inter alia, "the dispute concerning your failure to employ iron workers for work being performed at the jobsite." In addition, the demand letter stated that "it is not Local 40's intention to seek in this arbitration any directive by the arbitrator that any work performed by any other [union] be assigned to members of Local 40. The award sought in this arbitration is for money damages only."
 
 
 15
 On May 26, 1994, Cleveland filed this action against the Union and the Funds under 28 U.S.C. § 2201 and 29 U.S.C. § 185 to stay arbitration and for declaratory relief, arguing, inter alia, that (i) the CBA was no longer in force, and (ii) in any case, the defendants' "purported grievance is a jurisdictional dispute and thus is not referable to arbitration" under the CBA. The defendants counterclaimed to compel arbitration.
 
 
 16
 In a Memorandum Opinion and Order dated December 6, 1996, the district court compelled arbitration "of both issues": i.e., whether the CBA had been terminated by Cleveland and whether the dispute between the parties was a jurisdictional dispute. See Cleveland Wrecking Co., 947 F.Supp. at 748. With respect to the contract termination issue, the district court relied on this Court's opinion in Ottley v. Sheepshead Nursing Home, 688 F.2d 883, 886 (2d Cir.1982) for its conclusion that "[w]here, as here, a broad arbitration clause is involved, the issue of contract termination must be arbitrated if there is 'at least ... a colorable claim under the contract that the contract has not been terminated.' " Cleveland Wrecking Co., 947 F.Supp. at 749 (quoting Ottley, 688 F.2d at 886). The court concluded that there was a colorable claim of non-termination in this case because "[w]hether a notice of termination which was mailed but not received satisfies the contractual requirement that notice be 'given' to the other party is an issue which colorably requires interpretation of the terms of ... the CBA." Id. Therefore, "the question as to whether the February [ ] 1991 letter constituted compliance with the evergreen clause 'arises out of' the CBA and is therefore arbitrable." Id. On appeal, Cleveland does not dispute this conclusion.
 
 
 17
 With respect to the second issue, the district court first asserted that "section 36(2) expressly excludes 'jurisdictional disputes' from arbitration." Id. It then applied the same Ottley analysis it had utilized in connection with the contract termination issue to the question "whether the instant claim falls under section 36(2) [of the CBA] relating to jurisdictional disputes. If the Union colorably claims that the instant dispute does not constitute a 'jurisdictional dispute' within the meaning of the CBA, then the issue is likewise arbitrable." Id. The court found that the Union had such a colorable claim. Although the CBA does not define the term "jurisdictional dispute," the court looked to case law and to 29 U.S.C. § 158(b)(4)(D), in support of the contention that "jurisdictional disputes" necessarily involve equitable relief (i.e., assignment of work to be performed). Since the Union had pursued this sort of equitable relief against Mason Tenders under the New York Plan and "now seeks only money damages in the form of wages, union dues, and benefits that [its] members would have received if the work had been awarded to them," the court concluded, "it is at least arguable that the Union's claim for monetary damages does not fall within the meaning of the term 'jurisdictional dispute.' " Cleveland Wrecking, 947 F.Supp. at 749-50. Cleveland could plausibly argue to the contrary, the court said, but this only "reinforce[d] the conclusion" that the question of whether the dispute was a jurisdictional one was a question of contract interpretation, to be resolved by the arbitrator. See id. at 750. Accordingly, the district court denied Cleveland's request to stay arbitration and granted defendants' request to compel it.
 
 Discussion
 
 18
 "We review de novo a district court's determination of the arbitrability of a claim." State of New York v. Oneida Indian Nation of New York, 90 F.3d 58, 60 (2d Cir.1996). We undertake this review against the backdrop of the well-established principle that "the question of arbitrability--whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance--is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT & T Tech., Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). See also Litton Fin. Printing v. N.L.R.B., 501 U.S. 190, 208, 111 S.Ct. 2215, 2226, 115 L.Ed.2d 177 (1991) ("Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court....").
 
 
 19
 Cleveland contends that the district court erred in concluding: (i) that it was arguable whether the dispute between the parties was "jurisdictional" and (ii) that the issue whether the dispute is "jurisdictional" is therefore subject to arbitration. However, we need not decide these issues because we conclude that the district court's belief that Section 36(2) of the CBA excludes jurisdictional disputes from the general arbitration process established in Section 36(1) was mistaken.[2]
 
 
 20
 We note first that Section 36(2) is not, by its terms, limited to jurisdictional disputes, or, indeed, to any particular provisions at all. Rather, it states that Section 36(1) should not be construed as qualifying or changing "any provisions of this Agreement including, but not limited to the handling of negotiations for a new Agreement, changes in wage scale or jurisdictional disputes." (emphasis added). On its face, therefore, Section 36(2) treats provisions of the CBA relating to jurisdictional disputes no differently than it treats any other provisions. Moreover, Section 36(2) itself does not exempt anything from arbitration. Rather, Section 36(2) simply cautions that the general arbitration provisions should not be interpreted to "qualify[ ]" or "change" any other aspect of the CBA. The clause seems to express the concern that, notwithstanding the informal, often freewheeling, nature of arbitration, arbitrators are not at liberty to depart from or to vary the terms of the agreement.
 
 
 21
 The question presented is, accordingly, whether the agreement, considered as a whole, calls for arbitration of the type of dispute presented. The arguably relevant provisions are § 36(1) and § 2. Section 36(1) provides a broad arbitration agreement for all disputes "between the Union and the Employer arising out of the Agreement." Unless § 2 creates an exception for disputes like the instant one, the dispute would fall under the broad sweep of § 36(1).
 
 
 22
 It is true that § 2 generally addresses jurisdictional matters and refers to "decisions and awards by the Joint Trade Arbitration Plan of the New York Building Trades." If § 2 commanded that New York Plan was the exclusive means of resolving jurisdictional disputes, then it would provide an exception, and such disputes would not fall under the general arbitration provision of § 36(1).
 
 
 23
 But § 2 does not command an exclusive process in a dispute between the employer and the Union. It merely provides that, "with respect to all jurisdictional disputes" the parties "are subject to and agree to be bound by decisions and awards" rendered under the New York Plan (which might arise, as here, out of inter-union disputes).
 
 
 24
 Accordingly, even if the dispute is properly considered "jurisdictional," it is nonetheless covered by the general arbitration provision of § 36(1). There is nothing in the CBA that would exempt it from the broad sweep of that provision. Cf. Active Glass Corp. v. Architectural and Ornamental Iron Workers Local Union 580, 875 F.Supp. 245, 249 (S.D.N.Y.1995) (concluding that a similar provision "does not require the non-arbitration of jurisdictional disputes" but rather "merely specifies that jurisdictional claims are subject to certain limitations"; "[t]his may place a constraint on the range of options open to an arbitrator, but it should not be construed as precluding all arbitration of jurisdictional issues."). Therefore, the dispute was properly remitted to arbitration.
 
 
 25
 We have considered appellant's other arguments and find them to be without merit.
 
 Conclusion
 
 26
 For the reasons stated above, the judgment of the district court is affirmed.
 
 
 
 [1]
 The Honorable Harold Baer, Jr., United States District Judge for the Southern District of New York, sitting by designation
 
 
 [2]
 Cleveland urges that appellees are precluded from raising this argument because appellees did not cross-appeal this aspect of the district court's decision. However, an " 'appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack on the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.' " International Ore & Fert. Corp. v. SGS Control Services, Inc., 38 F.3d 1279, 1285 (2d Cir.1994), cert. denied, 515 U.S. 1122, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995) (quoting United States v. American Ry. Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 563-64, 68 L.Ed. 1087 (1924)). Because our conclusion that jurisdictional disputes are subject to arbitration under the CBA leads to the same result as that reached by the district court--denial of Cleveland's motion to stay arbitration and granting of the defendants' motion to compel arbitration--Cleveland's argument lacks merit